# EXHIBIT A

**ELECTRONICALLY FILED**
2022 Apr 26 PM 3:58
CLERK OF THE NEOSHO-CHANUTE DISTRICT COURT
CASE NUMBER: NOC-2022-CV-000020
PII COMPLIANT

**IN THE THIRTY-FIRST JUDICIAL DISTRICT**
**DISTRICT COURT OF NEOSHO COUNTY, KANSAS**
**CIVIL DEPARTMENT**

| | |
|---|---|
| **DOROTHY BLOOD**, **TYLER BLOOD**, and **PEGGY WITTUM**, as individuals and on behalf of all others similarly situated, | CASE NO.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| **LABETTE COUNTY MEDICAL CENTER**, d/b/a **LABETTE HEALTH**, Registered Agent: Spenserv, Inc. 6201 College Blvd., Ste. 500 Overland Park, Kansas 66211 | |
| Defendant. | |

Dorothy Blood, Tyler Blood, and Peggy Wittum ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Labette County Medical Center, d/b/a Labette Health ("Labette" or "Defendant"), a Kansas not-for-profit general hospital organized pursuant to Kan. Stat. Ann. § 19-4601, *et seq*. Plaintiffs seek to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of his counsel, and the facts that are a matter of public record:

**NATURE OF THE ACTION**

1.      This class action arises out of the recent targeted data breach of the computer network for Labette Health, a Kansas not-for-profit general hospital. Through this Data Breach, an unauthorized third-party was able to access Defendant's insufficiently secured computer

network and exfiltrate a wealth of unencrypted data, including the removal of the highly sensitive personal information and medical records of approximately 85,635 current and former patients and employees (the "Data Breach").

2.      As a result of the Data Breach, Plaintiffs and similarly situated individuals suffered ascertainable losses in the form of loss of the value of their private and confidential information, loss of the benefit of their contractual bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

3.      Plaintiffs bring this suit on their own behalf and for similarly situated individuals whose sensitive personal information was entrusted to Defendant's officials and agents, then compromised, unlawfully accessed, and stolen during the Data Breach (collectively "Class Members"). Information compromised in the Data Breach includes individuals' full name, Social Security number, and other personally identifiable information ("PII"), as well as information related to medical treatment and diagnosis information, treatment costs, dates of service, prescription information, Medicare or Medicaid number, and/or health insurance information, considered protected health information as defined by the HIPAA ("PHI"), all of which Defendant collected and retained on its network (collectively the "Private Information").

4.      In addition, some of the Private Information stolen belonged to minor children who were patients of Labette Health or the children of employees. These Class Members are especially vulnerable when their Private Information is sold on the Dark Web, as explained further below.

5.      Plaintiffs bring this class action lawsuit on behalf of themselves and those similarly situated to address: 1) Defendant's inadequate safeguarding of Class Members' Private Information, 2) for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their Private Information was subject of this Data Breach, and 3) for failing to notify

Plaintiffs and Class Members precisely what specific Private Information was accessed and exfiltrated.

6.     Defendant maintained Plaintiffs' and Class Members' Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition that left it vulnerable to cyberattacks and the exfiltration of Plaintiffs' and Class Members' PII and PHI, as actually happened in this Data Breach.

7.     Upon information and belief, this Data Breach and the potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known and foreseeable risk to Defendant, and thus Defendant was on notice that if it failed to take steps necessary to secure its patients' and employees' Private Information (as it did), the PII and PHI would be a dangerous condition and at risk of being stolen.

8.     Defendant and its employees had a clearly defined, mandatory duty to properly monitor the computer network and systems that housed patients' Private Information, to put into place systems to promptly discover any unauthorized intrusion to reduce any damage that could be suffered by the Class Members, yet it failed to meet this duty.

9.     Because of the Data Breach, Plaintiffs' and Class Members' PII and PHI was accessed and exfiltrated by cybercriminals, and upon information and belief, Defendant's systems were not fully operable during its investigation of the Data Breach, resulting in a disruption of its access to Plaintiffs' and Class Members' medical records, risking impediments to certain patients' healthcare.

10.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves and potentially being sold on the dark web.

11.     Armed with the Private Information accessed in the Data Breach, data thieves can

commit a variety of crimes including, e.g., opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' health information to target other phishing and hacking intrusions based on their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12.     As a further result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

13.     Plaintiffs and Class Members have and may incur out of pocket costs in the future when they pay for, among other things, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14.     As a direct and proximate result of the Data Breach and subsequent exfiltration of PII and PHI data, Plaintiffs and Class Members have suffered and will continue to suffer damages and economic losses in the form of the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges, putting alerts on their credit files, and dealing with spam messages and e-mails received as a result of the Data Breach.

15.     Plaintiffs and Class Members have likewise suffered and will continue to suffer an invasion of their property interest in their own PII and PHI such that they are entitled to damages for unauthorized access to, theft of, and misuse of their PII and PHI from Defendant.

16.     Plaintiffs and Class Members will suffer from future damages associated with the unauthorized use and misuse of their PII and PHI, as thieves are likely to use the Private

4

Information to obtain money and credit in Plaintiffs' and Class Members' names for years.

17.     Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed and/or removed from the network during the Data Breach.

18.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

19.     Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct asserting claims for breach of implied contract, unjust enrichment, breach of the Kansas Protection of Consumer Information Act, Kan. Stat. Ann. § 50-7a02 ("PCI"), and breach of Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623 *et seq.* ("Kansas CPA").

## PARTIES

20.     Plaintiff Dorothy Blood is, and at all times mentioned herein was, an individual citizen of the State of Kansas residing in Cherryvale (Montgomery County), Kansas. Plaintiff was patient of Defendant. Plaintiff received notice from Labette that the Data Breach had occurred following an attack on Labette's computer systems. A copy of the notice is attached hereto as Exhibit A.

21.     Plaintiff Tyler Blood is, and at all times mentioned herein was, an individual citizen of the State of Kansas residing in Cherryvale (Montgomery County), Kansas. Plaintiff was patient of Defendant. Plaintiff received notice from Labette that the Data Breach had occurred following an attack on Labette's computer systems. A copy of the notice is attached hereto as Exhibit B.

22.     Plaintiff Peggy Wittum is, and at all times mentioned herein was, an individual

citizen of the State of Kansas residing in Independence (Montgomery County), Kansas. Plaintiff is a former patient of Defendant. Plaintiff received notice from Labette that the Data Breach had occurred following an attack on Labette's computer systems. A copy of the notice is attached hereto as Exhibit C.

23.     Defendant Labette County Medical Center d/b/a Labette Health., is a Kansas county hospital organized pursuant to Kan. Stat. Ann. § 19-4601, *et seq.*, headquartered at 1902 S. U.S. Highway 59, Parsons, Kansas 67357. Labette can be served through its registered agent, Spenserv, Inc., at 6201 College Blvd., Suite 500, Overland Park, Kansas 66211.

## JURISDICTION AND VENUE

24.     Jurisdiction is proper in this Court because Defendant Labette is a Kansas county hospital that maintains places of business in various Kansas counties, including Neosho County, Kansas.

25.     This Court has subject matter jurisdiction over this matter pursuant to Kan. Stat. Ann. Const. Art. 3 § 6.

26.     This Court has general personal jurisdiction over Labette under Kan. Stat. Ann. 20-301 because it is incorporated under the laws of Kansas and has a place of business in Chanute (Neosho County), Kansas. In addition, (i) Defendant regularly does business or solicits business, engages in other persistent courses of conduct and/or derives substantial revenue from services provided to individuals in Neosho County and in the State of Kansas and (ii) Defendant has purposefully established substantial, systematic and continuous contacts with Neosho County and the State of Kansas and expects or should reasonably expect to be in court here.

27.     Defendant has (more than) sufficient minimum contacts with Neosho County such that this Court's exercise of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice.

28.     Venue is proper in Neosho County pursuant to Kan. Stat. Ann. § 60-604 because Defendant conducts its usual and customary business in this County.

**FACTUAL ALLEGATIONS**

*Defendant's Business*

29.     Defendant Labette Health provides comprehensive healthcare services to a six-county area of Southeastern Kansas since 1961, including a hospital located in Parsons, the Labette Health Independence Healthcare Center in Montgomery County, the Chanute Clinic and Express Care in Neosho County, additional Express Care locations, and multiple associated Health Clinics.[1]

30.     According to its website, "Labette Health (with the exception of Emergency Medical Services-EMS) operates without any tax support or direct financial subsidy from Labette County—totally funded by reimbursement from patients, insurance companies and donations."[2]

31.     As it conducts its business, at each of its facilities, Labette collects highly sensitive PII and PHI from its patients and employees. Indeed, Labette requires that patients disclose their PII and PHI in order to receive Labette's services.

32.     In the ordinary course of receiving medical care from Defendant, patients are required to provide (and Plaintiffs did in fact provide) Defendant with sensitive, personal and private information such as:

- Name, address, phone number and email address;

- Date of birth;

- Demographic information;

- Social Security number;

---

[1] https://www.labettehealth.com/about-us/ (last accessed April 12, 2022).
[2] https://www.labettehealth.com/ways-to-give/foundation-about-us/ (last accessed April 12, 2022).

- Information relating to individual medical history;

- Insurance information and coverage;

- Information concerning an individual's doctor, nurse or other medical providers;

- Photo identification;

- Employer information, and;

- Other information that may be deemed necessary to provide care.

33.     Labette's current and former employees were expected to provide similar information upon their employment with Labette.

34.     Although Labette collects patients' and employees' sensitive information, it claims it is "committed to maintaining the privacy and security of the information that it maintains" and that the "security of the personal information in its possession is Labette Health's top priority."[3]

35.     Additionally, Labette may receive private and personal information from other individuals and/or organizations that are part of a patient's "circle of care," such as referring physicians, patients' other doctors, patient's health plan(s), close friends, and/or family members.

36.     The patient information Labette collects and places on its computer network includes that of both adults and minors.

37.     Even though it claims that "the "security of the personal information in its possession is Labette Health's top priority,"[4] Labette does not follow industry standard practices in securing PII and PHI. On information and belief, Labette inadequately trains its employees on cybersecurity policies, fails to enforce those policies, or maintains unreasonable or inadequate

---

[3] https://www.labettehealth.com/about-us/labette-health-security-breach/ (last accessed April 12, 2022).
[4] *Id.*

security practices and systems.

*The Data Breach*

38.    According to its Notice Letters sent to Plaintiffs and Class Members, on October 14, 2021, Defendant Labette "identified unauthorized access to [its] network."[5] By February 11, 2022, Labette knew cyberthieves had unauthorized access to and "***removed***" files containing PII and PHI from Labette's network.[6]

39.    Labette began an investigation with outside professionals, who determined that cybercriminals "potentially accessed and acquired information from portions of its network between October 15, 2021 and October 24, 2021." By February 11, 2022, Labette had determined that the accessed or acquired files "contained identifiable personal and/or protected health information of employees and certain patients who received services from Labette Health."[7]

40.    Upon information and belief, the cyberattack targeted Defendant due to Defendant's status as a healthcare entity that collects, creates, and maintains both PII and PHI. This cyberattack was expressly designed to gain access to private and confidential data, including (among other things) the PII and PHI of patients and employees like Plaintiffs and Class Members.

41.    Labette stated that upon discovering the Data Breach, it "immediately took steps to secure its network and mitigate against any additional harm."[8]

42.    The investigation determined that the files impacted included Plaintiffs and Class Members' full name and "one or more of the following: Social Security number, medical

---

[5] *See, e.g.,* Notice Letter, attached as Exhibit A.
[6] https://www.labettehealth.com/about-us/labette-health-security-breach/ (last accessed April 12, 2022).
[7] *Id.*
[8] *Id.*

treatment and diagnosis information, treatment costs, dates of service, prescription information, Medicare or Medicaid number, and/or health insurance information." [9]

43.     Labette admits that it was only *after* the breach that it implemented new security measures. Specifically, it "strengthened its network and implemented additional security improvements recommended by third-party cyber security experts. These include resetting account passwords and strengthening its password security policies, implementing multi-factor authentication for network access, upgrading its endpoint detection software, and coordinating additional employee training related to network security and threat detection."[10] Each of these measures could have—and should have—been in place prior to the Data Breach, and likely could have prevented the Data Breach from occurring.

44.     Despite learning of the Data Breach that occurred between October 15 and October 24, 2021, Labette did not file a breach notification with the U.S. Department of Health and Human Services ("HHS") Office for Civil Rights, a governmental agency, until March 11, 2022, *almost 5 months* after the Data Breach. At that time, it notified HHS that the Private Information of 85,635 individuals had been affected in the Data Breach.[11] As required by section 13402(e)(4) of the HITECH Act, the Secretary must post a list of breaches of unsecured protected health information affecting 500 or more individuals. Labette's breach was included in the Secretary's list.

45.     The Notice Letters that Labette sent to its Data Breach victims, including Plaintiffs and Class Members, are dated March 11, 2022, nearly 5 months after Labette knew of the Data Breach. *See* Plaintiffs' Notice Letters, attached as Exhibits A and B.

---

[9] *Id.*

[10] *Id.*

[11] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed April 12, 2022).

46.     Despite its lag in notification of the Data Breach that affected patients and employees, Labette offered victims of the attack just 12 months of identity theft services "through IDX, a data breach and recovery services expert, at no charge to Labette patients affected. These services include 12 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed identity theft recovery services."[12]

47.     As a consequence of the Data Breach on Defendant's computer systems, highly sensitive and private information belonging to Plaintiffs and Class Members that Defendant had a clearly defined, mandatory duty to protect was accessed and removed from Defendant's network.

48.     Based on the Notice of Data Breach letters they received, which informed Plaintiffs that their Private Information was "removed" from Defendant's network and computer systems, Plaintiffs reasonably believe their Private Information was stolen from Defendant's network in the Data Breach and was or will be sold on the Dark Web.

49.     Further, the removal of the Private Information from Defendant's system – information that included full names, dates of birth, and Social Security numbers (which are the keys to identity theft and fraud) demonstrates that this cyberattack was targeted.

50.     Cyberattacks against hospitals and healthcare organizations such as Defendant are targeted. According to the 2019 Health Information Management Systems Society, Inc. ("HIMMS") Cybersecurity Survey, "[a] pattern of cybersecurity threats and experiences is discernable across US healthcare organizations. Significant security incidents are a near-universal experience in US healthcare organizations with many of the incidents initiated by bad actors, leveraging e-mail as a means to compromise the integrity of their targets."[13] "Hospitals have

---

[12] *See, e.g.*, Exhibit A.
[13] https://www.himss.org/himss-cybersecurity-survey (last accessed April 5, 2022).

emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information (PII) for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[14]

51.     Defendant had clearly defined and mandatory obligations created by HIPAA, contract, industry standards, common law, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

52.     In Labette's Notice of Privacy Practices ("Privacy Notice"), it promises to "obtain [patients'] express written authorization before using or disclosing [their] information for any other purpose" than those purposes it lists, *e.g.*, to provide medical treatment, to seek payment, with business associates, etc. The Privacy Notice also states that Labette "require[s its] business associates to appropriately safeguard your information," despite its failure to do the same.[15]

53.     Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

54.     Defendant's data security obligations were particularly important given the substantial increase in data breaches, and particularly data breaches in the healthcare industry, preceding the date of the breach.

55.     Data breaches, including those perpetrated against the healthcare sector of the economy, have become widespread.

---

[14] Eyal Benishti, How to Safeguard Hospital Data from Email Spoofing Attacks, Chief Healthcare Executive (April 4, 2019) at: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last accessed April 26, 2022).
[15] https://www.labettehealth.com/notice-of-privacy-practices/ (last accessed April 26, 2022).

56.     In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[16]

57.      Of the 1,473 recorded data breaches, 525 of them, or 35.64%, were in the medical or healthcare industry.[17]

58.     The 525 reported breaches reported in 2019 exposed nearly 40 million sensitive records (39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.[18]

59.     Indeed, cyber- attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.

60.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[19]

61.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Labette.

### *Defendant also Fails to Protect Children's Private Information*

62.     According to a 2021 study by Javelin Research and Strategy, child identity fraud affects one out of every 500 children annually, costs U.S. families nearly $1 billion annually, and takes parents and guardians far longer to resolve than adult identity fraud.[20]

---

[16] https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed April 26, 2022).
[17] *Id.*
[18] *Id.* at p. 15.
[19] *See* Maria Henriquez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last accessed April 26, 2022).
[20] https://www.javelinstrategy.com/research/child-identity-fraud-web-deception-and-loss (last accessed April 15, 2022).

63.     According to this research, "One of the most daunting challenges, as it relates to detecting the theft or compromise of a child's identity, is that fraud typically takes place years after a child's personally identifiable information (PII) is initially breached." Because children are not filing taxes, applying for loans, and opening bank accounts, misuse of their Private Information is less often flagged early, and therefore can abused for much longer before detected.[21]

64.     A child's "blank slate" provides cyber criminals the opportunity to create a "synthetic" identity using both real and fictitious information to seek loans since a child's Social Security number completely lacks a credit history.[22]

65.     According to the FTC, cybercriminals armed with children's Social Security numbers, name, address, and date of birth are able to:  apply for government benefits, like health care coverage or nutrition assistance; open a bank or credit card account; apply for a loan; sign up for a utility service, like water or electricity; or rent a place to live.[23]

66.     Although checking a child's credit report is a step that concerned parents should take, it is more difficult that checking an adult's credit report. A child's credit check may require requesting that each of the three reporting agencies perform a manual search and may require providing additional documentation, including but not limited to: the parent or legal guardian's driver's license or government-issued identification card; proof of the parent or legal guardian's address, (a utility bill, or a credit card or insurance statement); the child's birth certificate; and the child's Social Security card.[24] Each of these requirements can present hurdles—and are time-

---

[21] *Id.*

[22] *What is Child Identity Theft?,*  Identity Theft Resource Center, https://www.idtheftcenter.org/help_center/what-you-need-to-know-about-child-identity-theft/ (last accessed April 26, 2022).

[23] https://consumer.ftc.gov/articles/how-protect-your-child-identity-theft (last accessed April 26, 2022).

[24] *Id.*

consuming—for parents who receive notice of a data breach affecting children.

67.     Minor child patients are among the Class Members who received notice letters informing their parents that their children's Social Security numbers were stolen in Labette's Data Breach. Labette's failure to keep their Private Information secure is especially egregious and likely to result in decades of misuse.

### Defendant Fails to Comply with FTC Guidelines

68.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

69.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[25] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[26]

70.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex

---

[25] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed April 26, 2022).
[26] *Id.*

passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

71.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

72.     These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.")

73.     Defendant failed to properly implement basic data security practices.

74.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

75.     Defendant was at all times fully aware of its obligation to protect the PII and PHI of patients as outlined in its Privacy Notice and even expected its business associates to be aware of their obligation to protect Labette's patients' information.[27] Defendant was aware of the significant repercussions that would result from its failure to protect the PHI and PII of its

---

[27] https://www.labettehealth.com/notice-of-privacy-practices/ (last accessed April 26, 2022).

patients, including Plaintiffs and Class members.

*Defendant Fails to Comply with Industry Standards*

76.     As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

77.     Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

78.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

79.     Upon information and belief, Defendant failed to meet the minimum standards of the following cybersecurity frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.

80.     These frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the

door to and causing the Data Breach.

*Defendant's Conduct Violates HIPAA and Evidences Its Insufficient Data Security*

81.     HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

82.     Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

83.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D); and 45 C.F.R. § 164.530(b).

84.     Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate they failed to comply with safeguards mandated by HIPAA regulations.

85.     Defendant's duty to protect patients' Private Information is neither a discretionary function nor discretionary duty under HIPAA.

*Defendant's Breach*

86.     Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems, network, and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.      Failing to maintain an adequate data security system to reduce the risk of data breaches and Data Breaches;

b.      Failing to adequately protect patients' Private Information;

c.      Failing to properly monitor its own data security systems for existing intrusions, brute-force attempts, and clearing of event logs;

d.      Failing to apply all available security updates;

e.      Failing to install the latest software patches, update its firewalls, check user account privileges, or ensure proper security practices;

f.      Failing to practice the principle of least-privilege and maintain credential hygiene;

g.      Failing to avoid the use of domain-wide, admin-level service accounts;

h.      Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

i.      Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

j.      Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

k.      Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and

security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

l.      Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

m.      Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

n.      Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

o.      Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

p.      Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

87.     As the result of computer systems in dire need of security upgrading and

inadequate procedures for handling cybersecurity threats, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

88.     Accordingly, as outlined below, Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

### Data Breaches Put Consumers at an Increased Risk of Fraud and Identity Theft.

89.     Data Breaches at medical facilities such as Defendant's are especially problematic because of the disruption they cause to the medical treatment and overall daily lives of patients affected by the attack.

90.     For instance, loss or interruption of access to patient histories, charts, images and other information forces providers to limit or cancel patient treatment because of the disruption of service. Any interruption can lead to a deterioration in the quality of overall care patients receive at facilities affected by Data Breaches and related data breaches.

91.     Data Breaches that result in the removal of protected data are also considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40.

92.     Data breaches represent a significant problem for patients who have already experienced inconvenience and disruption associated with a Data Breach.

93.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face

"substantial costs and time to repair the damage to their good name and credit record."[28]

94.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[29]

95.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

96.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

97.     In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

98.     Theft of Private Information is also gravely serious. PII/PHI is a valuable property right.[30] Its value is axiomatic, considering the value of Big Data in corporate America and the

---

[28] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed April 12, 2022) ("GAO Report").

[29] *See* https://www.identitytheft.gov/Steps (last accessed April 12, 2022).

[30] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies

consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

99.     Theft of PHI, in particular, is gravely serious: "Medical identity theft is when someone uses your personal information — like your name, Social Security number, health insurance account number or Medicare number — to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care. If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[31] Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

100.    It must also be noted there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[31] *See* Federal Trade Commission, *Medical Identity Theft*. Available at
https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed April 12, 2022).

*See* GAO Report, at p. 29.

101.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

102.    Where the most private information belonging to Plaintiffs and Class Members was accessed and removed from Defendant's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

103.    Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

104.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[32] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

105.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[33] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[34] Each of these fraudulent

---

[32] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed April 12, 2022).
[33] *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed April 12, 2022).
[34] *Id.* at 4.

activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

106.    Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[35]

107.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[36]

108.    Medical information is especially valuable to identity thieves. The asking price on the Dark Web for medical data is $50 and up.[37] Because of its value, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

109.    In recent years, the medical and financial services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this risk and strengthened its data systems accordingly. Defendant

---

[35] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015. Available at http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed April 12, 2022).
[36] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed April 12, 2022).
[37] *See* Omri Toppol, *Email Security: How You Are Doing It Wrong & Paying Too Much*, LogDog (Feb. 14, 2016), https://getlogdog.com/blogdog/email-security-you-are-doing-it-wrong/ (last accessed April 12, 2022).

was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

*Plaintiffs' Experiences*

Plaintiffs Dorothy and Tyler Blood

110.    Plaintiff Dorothy Blood is and at all times mentioned herein was an individual citizen residing in the State of Kansas, in the City of Cherryvale, Montgomery County.

111.    Plaintiff Tyler Blood is and at all times mentioned herein was an individual citizen residing in the State of Kansas, in the City of Cherryvale, Montgomery County.

112.    Plaintiffs Dorothy and Tyler Blood ("the Bloods") are a married couple who were both patients treated at Labette Health facilities. When they went to Labette, they were required to provide Labette with their Private Information.

113.    On or about March 11, 2022, the Bloods each received a mailed Notice of Data Breach Letter, related to Labette's October 2021 Data Breach. Attached as Exhibits A and B.

114.    The Notice Letters that Bloods received listed an extensive amount of their PII and PHI that was in files that were "removed" from Labette's network. The letters stated that their full names were among the files that "may have been accessed or acquired" along with one or more of the following: Social Security number, medical treatment and diagnosis information, treatment costs, dates of service, prescription information, Medicare or Medicaid number, and/or health insurance information." Exhibits A and B.

115.    The Bloods are both alarmed by the amount of their Private Information that was stolen or accessed, and even more by the fact that both spouses' Social Security numbers were identified as among the breached data on Labette's computer system.

116.    Since Labette's Data Breach, the Bloods have had unauthorized charges made to their bank account, paid overdraft fees in excess of $500 because each attempted withdrawal

triggered fees. It has taken the Bloods, collectively, approximately 5 to 6 hours to resolve these banking problems. As a result, the Bloods had to change their bank account and debit card numbers.

117.     In addition, when the Bloods filed their taxes in February 2022, they received notice from the IRS that their Social Security number(s) had issues. They had to prove their identity to before the tax return was processed.

118.     Since Labette's Data Breach, the Bloods have been notified that their PII was found on the "dark web."

119.     Since approximately December 2021, Mr. Blood has been receiving a significantly higher number of spam emails, calls, and texts. In the past, he rarely received calls from telemarketers; now he receives several a day.

120.     Since the Labette Data Breach, the Bloods, individually and together, monitor their accounts daily and spend about 7 hours per week doing so.

121.     The Bloods are aware that cybercriminals often sell Private Information, and that theirs could be abused months or even years after a data breach.

122.     Had Dorothy and Tyler Blood been aware that Labette's computer systems were not secure, they would not have entrusted Labette with their Private Information.

Plaintiff Peggy Wittum

123.     Plaintiff Peggy Wittum is and at all times mentioned herein was an individual citizen residing in the State of Kansas, in the City of Independence, Montgomery County.

124.     Plaintiff Wittum is a former patient treated at Labette Health facilities. When she went to Labette, she was required to provide Labette with her Private Information.

125.     On or about March 13, 2022, Ms. Wittum received a mailed Notice of Data Breach Letter, related to Labette's October 2021 Data Breach. Attached as Exhibit C.

126.    The Notice Letter that Ms. Wittum received listed an extensive amount of her PII and PHI that was in files that were "removed" from Labette's network. The letter stated that her full name was among the files that "may have been accessed or acquired" along with one or more of the following: Social Security number, medical treatment and diagnosis information, treatment costs, dates of service, prescription information, Medicare or Medicaid number, and/or health insurance information." Exhibit C.

127.    Ms. Wittum is alarmed by the amount of her Private Information that was stolen or accessed, and even more by the fact that her Social Security number and personal medical treatment and diagnoses were identified as among the breached data on Labette's computer system.

128.    Ms. Wittum has been receiving a significantly higher number of spam calls. In the past, she rarely received these sorts of calls; now she receives between 10 and 15 per day, although they seem to be slowing down recently. Although she cannot be certain that these are related to the Data Breach, she believes that it probably is.

129.    Since the Labette Data Breach, Ms. Wittum and/or her husband monitor their financial accounts each week for approximately an hour.

130.    Ms. Wittum has also signed up for the one year of data protection services offered by Labette through IDX but believes one year is inadequate, especially since Labette took about 5 months to even notify its patients and employees of the Data Breach.  She is aware that cybercriminals often sell Private Information, and that hers could be abused months or even years after a data breach.

131.    Had Ms. Wittum been aware that Labette's computer systems were not secure, she would not have entrusted Labette with her Private Information.

*Plaintiffs' and Class Members' Damages*

28

132.     To date, Defendant has done absolutely nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach and data breach.

133.     Moreover, Labette has offered only a paltry one year of identity theft monitoring and identity theft protection through IDX. This one-year limitation is inadequate when victims are likely to face many years of identity theft.

134.     Defendant Labette's credit monitoring offer and advice to Plaintiffs and Class Members squarely places the burden on Plaintiffs and Class Members, rather than on the Defendant, to monitor and report suspicious activities to law enforcement. In other words, Labette expects Plaintiffs and Class to protect themselves from its tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent instructions to Plaintiffs and Class Members about actions they can affirmatively take to protect themselves.

135.     These services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII and PHI.

136.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

137.     Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

138.     Plaintiffs and Class Members face substantial risk of being targeted for future

29

phishing, data intrusion, and other illegal schemes based on their Private Information as fraudsters can use that information to target such schemes more effectively to Plaintiff and Class Members.

139.    Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

140.    Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

141.    Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Part of the price Class Members paid to Defendant was intended to be used by Defendant to fund adequate security of Defendant's computer property and Plaintiffs' and Class Members' Private Information. Thus, Plaintiff and the Class Members did not get what they paid for. Specifically, they overpaid for services that were intended to be accompanied by adequate data security but were not.

142.    Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

143.    Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial and medical accounts and records for misuse.

144.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach.

145.    In addition, many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects

of the Data Breach relating to:

    a.    Finding fraudulent charges;

    b.    Canceling and reissuing credit and debit cards;

    c.    Purchasing credit monitoring and identity theft prevention;

    d.    Addressing their inability to withdraw funds linked to compromised accounts;

    e.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

    f.    Placing "freezes" and "alerts" with credit reporting agencies;

    g.    Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    h.    Contacting financial institutions and closing or modifying financial accounts;

    i.    Gathering extensive documentation to monitor whether a child's PII and PHI have been sold and watching for unauthorized activity using the child's Social Security number;

    j.    Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

    k.    Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

    l.    Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

146.    Plaintiffs and Class Members have an interest in ensuring that their Private

Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password-protected.

## CLASS ACTION ALLEGATIONS

147.    Plaintiffs bring this action on behalf of a class of all other persons similarly situated in the State of Kansas pursuant to Kan. Stat. Ann. 60-223 and proposes to (tentatively) define the Class as:

> **Class:** All persons whose PII and/or PHI was compromised as a result of the Data Breach that Labette discovered on or about October 11, 2021 (the "Class").

148.    Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

149.    Plaintiffs reserve the right to amend the definitions of the Class or add a Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

150.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

151.    <u>Numerosity, Kan. Stat. Ann. 60-223(a)</u>. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Classes consists of over 115,670 current and former patients and employees of Labette whose data was compromised in the Data

Breach. The Class defined above is identifiable through Labette's business records.

152. <u>Commonality and Predominance, Kan. Stat. Ann. 60-223(b)</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a) Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c) Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

d) Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e) Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f) Whether Defendant breached their duty to Class Members to safeguard their Private Information;

g) Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h) Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i) Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j)      Whether Defendant owed a duty to provide Plaintiffs and Class Members
complete and prompt notice of this data breach, and whether Defendant
breached that duty;

k)      Whether Defendant's actions violated state or federal laws;

l)      Whether Plaintiffs and Class Members are entitled to damages, treble
damages, civil penalties, punitive damages, and/or injunctive relief; and

m)      Whether Defendant has engaged in a common course of conduct toward
Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members'
data was stored on the same computer systems and unlawfully accessed in
the same way.

153.    The common issues arising from Defendant's conduct affecting Class Members set
out above predominate over any individualized issues. Adjudication of these common issues in
a single action has important and desirable advantages of judicial economy.

154.    <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for
certification because Defendant has acted or refused to act on grounds generally applicable to the
Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards
of conduct toward the Class Members and making final injunctive relief appropriate with respect
to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members
uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect
to the Class as a whole, not on facts or law applicable only to Plaintiff. Plaintiffs' claims are typical
of those of other Class Members because Plaintiffs' information, like that of every other Class
Member, was compromised in the Data Breach.

155.    <u>Adequacy of Representation, Kan. Stat. Ann. 60-223(g)</u>. Plaintiffs will fairly and
adequately represent and protect the interests of the Class Members in that they have no disabling

conflicts of interest that would be antagonistic to that of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

156.    Superiority, Kan. Stat. Ann. 60-223(b)(3). The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

157.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a

risk of inconsistent results and would be unnecessary and duplicative of this litigation.

158.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

159.    Notice, Kan. Stat. Ann. 60-223(c)(2). Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

160.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII and PHI of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

161.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

## CAUSES OF ACTION

### Count I
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and All Class Members)**

162.    Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

163.    Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, as well as implied contracts for the Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' Private Information.

164.    Specifically, Plaintiffs and Class Members entered into a valid and enforceable implied contract with Defendant when they first went medical care and treatment at one of Defendant's facilities.

165.    The valid and enforceable implied contracts to provide health care services that Plaintiffs and Class Members entered into with Defendant include Defendant's promise to protect nonpublic Private Information given to Defendant or that Defendant creates on its own from disclosure.

166.    When Plaintiffs and Class Members provided their Private Information to Defendant in exchange for Defendant's services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

167.    Defendant solicited and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

168.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

169.    Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

170.    Under the implied contracts, Defendant and/or its affiliated healthcare providers, promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs' and the Class Members' PII/PHI: (i) provided to obtain such healthcare; and/or (ii) created as a result of providing such healthcare. In exchange, Plaintiff and Members of the Class agreed to pay money for these services, and to turn over their Private Information.

171.    Both the provision of healthcare and the protection of Plaintiffs' and Class Members' Private Information were material aspects of these implied contracts.

172.    The implied contracts for the provision of medical services – contracts that include the contractual obligations to maintain the privacy of Plaintiffs' and Class Members' Private Information—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's Privacy Notice.

173.    Defendant's express representations, including, but not limited to the express representations found in its Privacy Practices, memorializes and embodies the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs and Class Members' Private Information.

174.    Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining healthcare private. To patients such as Plaintiffs and Class Members, healthcare that does not adhere to industry standard data security protocols to protect Private Information is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security.

175.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected or entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

176.    A meeting of the minds occurred, as Plaintiffs and Members of the Class agreed to and did provide their Private Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, both the provision of healthcare and the protection of their Private Information.

177.    Plaintiffs and Class Members performed their obligations under the contract when they paid for their health care services and provided their Private Information.

178.    Defendant materially breached its contractual obligation to protect the nonpublic Private Information Defendant gathered when the information was accessed and exfiltrated by unauthorized personnel as part of the Data Breach.

179.    Defendant materially breached the terms of the implied contracts, including, but not limited to, the terms stated in the relevant Notice of Privacy Practices.

180.    Defendant did not maintain the privacy of Plaintiffs' and Class Members' Private Information as evidenced by its notifications of the Data Breach to Plaintiff and approximately 85,635 Class Members. Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like HIPAA, 42 U.S.C. §§ 1301, *et seq.*, and Section 5 of the FTC Act, or otherwise protect Plaintiffs' and the Class Members' Private Information, as set forth above.

181.    The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

182.    As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiffs and Members of the Class did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in the contracts. Plaintiffs and Class Members therefore were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

183.    Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated

healthcare providers.

184.    As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out-of-pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

185.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

186.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**Count II**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

187.    Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein. This claim is plead in the alternative to the breach of implied contract claim above.

188.    Plaintiffs and Class Members conferred a monetary benefit upon Labette in the form of monies paid for medical treatment and services at its health facilities.

189.    Labette appreciated or had knowledge of the benefits conferred upon them by Plaintiffs and Class Members. Labette also benefited from the receipt of Plaintiffs' and Class members' Personal Information, as this was utilized by Labette to facilitate payment to it from its patients, insurance companies, and other entities.

190.    The monies that Plaintiffs and Class Members paid for health-related services to Labette were supposed to be used by Labette, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

191.    As a result of Labette's conduct, Plaintiffs and class members suffered actual damages in an amount equal to the difference in value between the money Plaintiffs and Class Members paid for health services assuming reasonable data privacy and security practices and procedures that, and the cost of those health services without unreasonable data privacy and security practices and procedures in place.

192.    Under principals of equity and good conscience, Labette should not be permitted to retain the money belonging to Plaintiffs and Class Members because Labette failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiffs and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

193.    Labette should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged in this Complaint.

**Count III**
**Violation of Kansas Protection of Consumer Information**
**Kansas Stat. Ann. § 50-7a02(a)**
**(On Behalf of Plaintiffs and the Class)**

194.    Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

195.    Defendant is a business that owns or licenses computerized data that includes Personal Information as defined by Kan. Stat. Ann. § 50-7a02(a).

196.    Plaintiffs and Class Members' PII and PHI includes Personal Information as

41

covered under Kan. Stat. Ann. § 50-7a02(a).

197.    Defendant is required to accurately notify Plaintiffs and Class Members if it becomes aware of a breach of its data security system that was reasonably likely to have cause misuse of Plaintiffs' and Class's Personal Information in the most expedient time possible and without unreasonable delay under Kan. Stat. Ann. § 50-7a02(a).

198.    Because Defendant was aware of a breach of its network that was reasonably likely to have cause misuse of Plaintiff and Class's Personal Information, Defendant had an obligation to disclose the Data Breach in a timely and accurate manner as required under Kan. Stat. Ann. § 50-7a02(a).

199.    By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Kan. Stat. Ann. § 50-7a02(a).

200.    As a direct and proximate result of Defendant's violation of Kan. Stat. Ann. § 50-7a02(a), Plaintiffs and Class Members suffered damages as described above.

201.    Plaintiffs and Class Members seek relief under Kan. Stat. Ann. § 50-7a02(g), including equitable relief.

**Count IV**
**Violation of Kansas Consumer Protection Act**
**Kansas Stat. Ann. §§ 50-623,** *et seq.*
**(On Behalf of Plaintiffs and the Class)**

202.    Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

203.    Kansas Stat. Ann. §§ 50-623, *et seq.* is to be liberally construed to protect consumers from deceptive and unconscionable practices.

204.    Plaintiffs and Class Members are "consumers" as defined in Kan. Stat. Ann. 50-624(b).

205.     Plaintiffs and Class Members sought "consumer transactions" (medical services) from Defendant as defined in Kan. Stat. Ann. 50-624 (c).

206.     Defendant is a "supplier" of services, as defined in Kan. Stat. Ann. 50-624 (l).

207.     Defendant advertised, offered, or sold services in Kansas and engaged in trade or commerce directly or indirectly with the people of Kansas, including Plaintiff and Class.

208.     Defendant engaged in deceptive and unfair acts or practices, including:

> a.  Failing to implement and maintain reasonable security and privacy measures to protect its patients' and employees' Personal Information (including that of Plaintiffs and Class Members), which was a direct and proximate cause of the Data Breach;
>
> b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which was a direct and proximate cause of the Data Breach;
>
> c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' Personal Information, including duties imposed by, *inter alia*, the FTC Act, 15 U.S.C. § 45, HIPAA 42 U.S.C. §§ 1301, *et seq.*, and Kansas's identity fraud statute, the Wayne Owen Act, Kan. Stat. Ann. §50-6, 139b, which was a direct and proximate cause of the Data Breach;
>
> d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs and Class Members' Personal Information, including by implementing and maintaining reasonable security measures;
>
> e.  Misrepresenting that it would comply with common law and statutory duties

pertaining to the security and privacy of Plaintiffs' and Class members' Personal Information, including duties imposed by, *inter alia*, the FTC Act, 15 U.S.C. § 45; HIPAA, 42 U.S.C. §§ 1301, *et seq.*; and Kansas's identity fraud statute, the Wayne Owen Act, Kan. Stat. Ann. §50-6, 139b;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' Personal Information; and

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class members' Personal Information, including duties imposed by, *inter alia*, the FTC Act,15 U.S.C. § 45; HIPAA, 42 U.S.C. §§ 1301, *et seq.*; and Kansas's identity fraud statute, the Wayne Owen Act, Kan. Stat. Ann. §50-6,139b.

209.    Labette's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of its data security and ability to protect the confidentiality of patients' and employees' sensitive Personal Information.

210.    Labette intended to mislead Plaintiffs and Class Members and induce them to rely on its misrepresentations and omissions.

211.    As a direct and proximate result of Labette's unfair, deceptive, and unconscionable trade practices, Plaintiffs and Class Members have been aggrieved, and have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; imminent risk or fraud and identity theft; and loss of value of their sensitive personal information.).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Classes;

B.      For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from failing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.      For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII and PHI compromised during the Data Breach;

D.      For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.      Ordering Defendant to pay for not less than seven years of credit monitoring services for Plaintiffs and the Classes;

F.      For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.      For an award of punitive damages, as allowable by law;

H.      For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I.      Pre- and post-judgment interest on any amounts awarded; and

J.      Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all claims in this Complaint so triable. Plaintiffs also respectfully request leave to amend this Complaint to conform to the evidence, if such amendment is needed for trial.

Dated: April 26, 2022

Respectfully Submitted,

By: *Michael J. Fleming*
Michael J. Fleming   KS Bar #20291
KAPKE & WILLERTH, LLC
3304 NE Ralph Powell Road
Lee's Summit, Missouri 64064
(816) 461-3800 – Telephone
(816) 254-8014 – Fax
mike@kapkewillerth.com

Gary E. Mason*
  *gmason@masonllp.com*
Danielle L. Perry*
  *dperry@masonllp.com*
Lisa A. White*
  *lwhite@masonllp.com*
**MASON LLP**
5101 Wisconsin Ave. NW Ste. 305
Washington DC 20016
Phone: 202.640.1160
Fax: 202.429.2294

*Attorneys for Plaintiffs and the Class*

*pro hac vice forthcoming*

ELECTRONICALLY FILED
2022 Apr 26 PM 3:58
CLERK OF THE NEOSHO-CHANUTE DISTRICT COURT
CASE NUMBER:  NOC-2022-CV-000020
PII COMPLIANT

# EXHIBIT A

# Dorothy Blood Notice Letter



**Labette Health**
*We Center Around You.*

P.O Box 989728
West Sacramento, CA 95798-9728

To Enroll, Please Call:
1-833-774-1216
Or Visit:
https://app.idx.us/account-creation/protect
Enrollment Code: ▮▮▮▮▮

**IMPORTANT INFORMATION**
**PLEASE REVIEW CAREFULLY**

Dorothy McKinnisblood

March 11, 2022

Dear Dorothy:

We are writing with important information regarding a recent security incident. The privacy and security of the personal information we maintain is of the utmost importance to Labette Health. As such, we wanted to provide you with information about the incident, explain the services we are making available to you, and let you know that we continue to take significant measures to protect your information.

On October 14, 2021, Labette Health identified unauthorized access to our network. Upon learning of the issue, we immediately took steps to secure our network and mitigate against any additional harm. Additionally, we launched an investigation in consultation with outside cybersecurity professionals who regularly investigate and analyze these types of situations to determine whether any sensitive data had been compromised as a result. After an extensive forensic investigation we determined that as part of this incident, an unauthorized individual accessed and acquired information from our network between October 15, 2021 and October 24, 2021. Following a thorough review of the files that were removed, we discovered on February 11, 2022 that your full name and one or more of the following (to the extent it resided on our system) may have been accessed or acquired in this incident: Social Security number, medical treatment and diagnosis information, treatment costs, dates of service, prescription information, Medicare or Medicaid number, and/or health insurance information.

We have no evidence that any of your information has been misused. Nevertheless, out of an abundance of caution, we want to make you aware of the incident. To protect you from potential misuse of your information, we are offering a complimentary one-year membership of identity theft protection services through IDX, which includes 12 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services. With this protection, IDX will help you resolve issues if your identity is compromised.

This letter also provides other precautionary measures you can take to protect your personal information, including placing a fraud alert and/or security freeze on your credit files, and/or obtaining a free credit report. Additionally, you should always remain vigilant in reviewing your account statements for fraudulent or irregular activity on a regular basis. We have also included suggestions for protecting your medical information.

Please accept our apologies that this incident occurred. We are committed to maintaining the privacy of personal information in our possession and have taken many precautions to safeguard it. In response to this incident, we have strengthened our network and implemented additional security improvements recommended by third-party cyber security experts. These include resetting account passwords and strengthening our password security policies, implementing multi-factor authentication for network access, upgrading our endpoint detection software, and coordinating additional employee training related to network security and threat detection.

If you have any further questions regarding this incident, please call our dedicated and confidential toll-free response line that we have set up to respond to questions at 1-833-774-1216. This response line is staffed with

ELECTRONICALLY FILED
2022 Apr 26 PM 3:58
CLERK OF THE NEOSHO-CHANUTE DISTRICT COURT
CASE NUMBER:  NOC-2022-CV-000020
PII COMPLIANT

# EXHIBIT B

# Tyler Blood Notice Letter

Labette Health
*We Center Around You.*

P.O Box 989728
West Sacramento, CA 95798-9728

To Enroll, Please Call:
1-833-774-1216
Or Visit:
https://app.idx.us/account-creation/protect
Enrollment Code: ▮▮▮▮▮▮

**IMPORTANT INFORMATION**
**PLEASE REVIEW CAREFULLY**

Tyler Blood
▮▮▮▮▮▮▮▮▮
Cherryvale, KS ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

March 11, 2022

Dear Tyler:

We are writing with important information regarding a recent security incident. The privacy and security of the personal information we maintain is of the utmost importance to Labette Health. As such, we wanted to provide you with information about the incident, explain the services we are making available to you, and let you know that we continue to take significant measures to protect your information.

On October 14, 2021, Labette Health identified unauthorized access to our network. Upon learning of the issue, we immediately took steps to secure our network and mitigate against any additional harm. Additionally, we launched an investigation in consultation with outside cybersecurity professionals who regularly investigate and analyze these types of situations to determine whether any sensitive data had been compromised as a result. After an extensive forensic investigation we determined that as part of this incident, an unauthorized individual accessed and acquired information from our network between October 15, 2021 and October 24, 2021. Following a thorough review of the files that were removed, we discovered on February 11, 2022 that your full name and one or more of the following (to the extent it resided on our system) may have been accessed or acquired in this incident: Social Security number, medical treatment and diagnosis information, treatment costs, dates of service, prescription information, Medicare or Medicaid number, and/or health insurance information.

**We have no evidence that any of your information has been misused.** Nevertheless, out of an abundance of caution, we want to make you aware of the incident. To protect you from potential misuse of your information, we are offering a complimentary one-year membership of identity theft protection services through IDX, which includes 12 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services. With this protection, IDX will help you resolve issues if your identity is compromised.

This letter also provides other precautionary measures you can take to protect your personal information, including placing a fraud alert and/or security freeze on your credit files, and/or obtaining a free credit report. Additionally, you should always remain vigilant in reviewing your account statements for fraudulent or irregular activity on a regular basis. We have also included suggestions for protecting your medical information.

Please accept our apologies that this incident occurred. We are committed to maintaining the privacy of personal information in our possession and have taken many precautions to safeguard it. In response to this incident, we have strengthened our network and implemented additional security improvements recommended by third-party cyber security experts. These include resetting account passwords and strengthening our password security policies, implementing multi-factor authentication for network access, upgrading our endpoint detection software, and coordinating additional employee training related to network security and threat detection.

If you have any further questions regarding this incident, please call our dedicated and confidential toll-free response line that we have set up to respond to questions at 1-833-774-1216. This response line is staffed with



professionals familiar with this incident and knowledgeable on what you can do to protect against misuse information. The response line is available Monday through Friday, **8 a.m. to 8 p.m. Central Time.**

Sincerely,

Labette Health

ELECTRONICALLY FILED
2022 Apr 26 PM 3:58
CLERK OF THE NEOSHO-CHANUTE DISTRICT COURT
CASE NUMBER:  NOC-2022-CV-000020
PII COMPLIANT

# EXHIBIT C

# Peggy Wittum Notice Letter

 **Labette Health**
*We Center Around You.*

P.O Box 989728
West Sacramento, CA 95798-9728

To Enroll, Please Call:
1-833-774-1216
Or Visit:
https://app.idx.us/account-creation/protect
Enrollment Code: ███████████

**IMPORTANT INFORMATION
PLEASE REVIEW CAREFULLY**

Peggy Wittum

March 11, 2022

Dear Peggy:

We are writing with important information regarding a recent security incident. The privacy and security of the personal information we maintain is of the utmost importance to Labette Health. As such, we wanted to provide you with information about the incident, explain the services we are making available to you, and let you know that we continue to take significant measures to protect your information.

On October 14, 2021, Labette Health identified unauthorized access to our network. Upon learning of the issue, we immediately took steps to secure our network and mitigate against any additional harm. Additionally, we launched an investigation in consultation with outside cybersecurity professionals who regularly investigate and analyze these types of situations to determine whether any sensitive data had been compromised as a result. After an extensive forensic investigation we determined that as part of this incident, an unauthorized individual accessed and acquired information from our network between October 15, 2021 and October 24, 2021. Following a thorough review of the files that were removed, we discovered on February 11, 2022 that your full name and one or more of the following (to the extent it resided on our system) may have been accessed or acquired in this incident: Social Security number, medical treatment and diagnosis information, treatment costs, dates of service, prescription information, Medicare or Medicaid number, and/or health insurance information.

**We have no evidence that any of your information has been misused.** Nevertheless, out of an abundance of caution, we want to make you aware of the incident. To protect you from potential misuse of your information, we are offering a complimentary one-year membership of identity theft protection services through IDX, which includes 12 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services. With this protection, IDX will help you resolve issues if your identity is compromised.

This letter also provides other precautionary measures you can take to protect your personal information, including placing a fraud alert and/or security freeze on your credit files, and/or obtaining a free credit report. Additionally, you should always remain vigilant in reviewing your account statements for fraudulent or irregular activity on a regular basis. We have also included suggestions for protecting your medical information.

Please accept our apologies that this incident occurred. We are committed to maintaining the privacy of personal information in our possession and have taken many precautions to safeguard it. In response to this incident, we have strengthened our network and implemented additional security improvements recommended by third-party cyber security experts. These include resetting account passwords and strengthening our password security policies, implementing multi-factor authentication for network access, upgrading our endpoint detection software, and coordinating additional employee training related to network security and threat detection.

**If you have any further questions regarding this incident, please call our dedicated and confidential toll-free response line that we have set up to respond to questions at 1-833-774-1216.** This response line is staffed with

professionals familiar with this incident and knowledgeable on what you can do to protect against misuse of your information. The response line is available Monday through Friday, **8 a.m. to 8 p.m. Central Time.**

Sincerely,

Labette Health

## – OTHER IMPORTANT INFORMATION –

1.  **Enrolling in Complimentary 12-Month Credit Monitoring.**

**Activate IDX Identity Protection Membership Now in Three Easy Steps**

1.  ENROLL by: **June 10, 2022** (Your code will not work after this date.)
2.  VISIT the **IDX website** to enroll: https://app.idx.us/account-creation/protect
3.  PROVIDE the **Enrollment Code:** ███████████

If you have questions about the product or if you would like to enroll over the phone, please contact IDX at 1-833-774-1216.

2.  **Placing a Fraud Alert on Your Credit File.**

Whether or not you choose to use the complimentary 12 month credit monitoring services, we recommend that you place an initial one-year "Fraud Alert" on your credit files, at no charge. A fraud alert tells creditors to contact you personally before they open any new accounts. To place a fraud alert, call any one of the three major credit bureaus at the numbers listed below. As soon as one credit bureau confirms your fraud alert, they will notify the others.

| **Equifax** | **Experian** | **TransUnion LLC** |
|---|---|---|
| (800) 525-6285 | (888) 397-3742 | (800) 680-7289 |
| https://www.equifax.com/personal/credit -report-services/credit-fraud-alerts/ | https://www.experian.com/fraud/ center.html | https://www.transunion.com/fraud -alerts |
| P.O. Box 105788 | P.O. Box 9554 | P.O. Box 6790 |
| Atlanta, GA 30348 | Allen, TX 75013 | Fullerton, PA 92834-6790 |

3.  **Consider Placing a Security Freeze on Your Credit File.**

If you are very concerned about becoming a victim of fraud or identity theft, you may request a "Security Freeze" be placed on your credit file, at no charge. A security freeze prohibits, with certain specific exceptions, the consumer reporting agencies from releasing your credit report or any information from it without your express authorization. You may place a security freeze on your credit report by contacting all three nationwide credit reporting companies at the numbers below and following the stated directions or by sending a request in writing, by mail, to all three credit reporting companies:

| **Equifax Security Freeze** | **Experian Security Freeze** | **TransUnion Security Freeze** |
|---|---|---|
| P.O. Box 105788 | P.O. Box 9554 | P.O. Box 2000 |
| Atlanta, GA 30348 | Allen, TX 75013 | Chester, PA 19016 |
| https://www.equifax.com/personal/credit -report-services/credit-freeze/ | http://experian.com/freeze | http://www.transunion.com/credit -freeze |
| (800) 349-9960 | (888) 397-3742 | (888) 909-8872 |

In order to place the security freeze, you'll need to supply your name, address, date of birth, Social Security number and other personal information. After receiving your freeze request, each credit reporting company will send you a confirmation letter containing a unique PIN (personal identification number) or password. Keep the PIN or password in a safe place. You will need it if you choose to lift the freeze.

If your personal information has been used to file a false tax return, to open an account or to attempt to open an account in your name or to commit fraud or other crimes against you, you may file a police report in the city in which you currently reside.

If you do place a security freeze *prior* to enrolling in the credit monitoring service as described above, you will need to remove the freeze in order to sign up for the credit monitoring service. After you sign up for the credit monitoring service, you may refreeze your credit file.

4.  **Obtaining a Free Credit Report.**

Under federal law, you are entitled to one free credit report every 12 months from each of the above three major nationwide

credit reporting companies. Call 1-877-322-8228 or request your free credit reports online at www.annualcreditreport.com. Once you receive your credit reports, review them for discrepancies. Identify any accounts you did not open or inquiries from creditors that you did not authorize. Verify all information is correct. If you have questions or notice incorrect information, contact the credit reporting company.

## 5. Additional Helpful Resources.

Even if you do not find any suspicious activity on your initial credit reports, the Federal Trade Commission (FTC) recommends that you check your credit reports periodically. Checking your credit report periodically can help you spot problems and address them quickly.

If you find suspicious activity on your credit reports or have reason to believe your information is being misused, call your local law enforcement agency and file a police report. Be sure to obtain a copy of the police report, as many creditors will want the information it contains to absolve you of the fraudulent debts. You may also file a complaint with the FTC by contacting them on the web at www.ftc.gov/idtheft, by phone at 1-877-IDTHEFT (1-877-438-4338), or by mail at Federal Trade Commission, Consumer Response Center, 600 Pennsylvania Avenue, NW, Washington, DC 20580. Your complaint will be added to the FTC's Identity Theft Data Clearinghouse, where it will be accessible to law enforcement for their investigations. In addition, you may obtain information from the FTC about fraud alerts and security freezes.

If this notice letter states that your financial account information was impacted, we recommend that you contact your financial institution to inquire about steps to take to protect your account, including whether you should close your account or obtain a new account number.

**Iowa Residents:** You may contact law enforcement or the Iowa Attorney General's Office to report suspected incidents of Identity Theft. Office of the Attorney General of Iowa, Consumer Protection Division, Hoover State Office Building, 1305 East Walnut Street, Des Moines, IA 50319, www.iowaattorneygeneral.gov, Telephone: (515) 281-5164

**Maryland Residents:** You may obtain information about avoiding identity theft from the Maryland Attorney General's Office: Office of the Attorney General of Maryland, Consumer Protection Division, 200 St. Paul Place, Baltimore, MD 21202, www.oag.state.md.us/Consumer, Telephone: 1-888-743-0023.

**North Carolina Residents:** You may obtain information about preventing identity theft from the North Carolina Attorney General's Office: Office of the Attorney General of North Carolina, Consumer Protection Division, 9001 Mail Service Center, Raleigh, NC 27699-9001, www.ncdoj.gov, Telephone: 877-566-7226.

**New York Residents:** You may obtain information about preventing identity theft from the New York Attorney General's Office: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; https://ag.ny.gov/consumer-frauds-bureau/identity-theft; Telephone: 800-771-7755.

**Oregon Residents:** You may obtain information about preventing identity theft from the Oregon Attorney General's Office: Oregon Department of Justice, 1162 Court Street NE, Salem, OR 97301-4096, www.doj.state.or.us/, Telephone: 877-877-9392

## 6. Protecting Your Medical Information.

We have no information to date indicating that your medical information involved in this incident was or will be used for any unintended purposes. As a general matter, however, the following practices can help to protect you from medical identity theft.

* Only share your health insurance cards with your health care providers and other family members who are covered under your insurance plan or who help you with your medical care.

* Review your "explanation of benefits statement" which you receive from your health insurance company. Follow up with your insurance company or care provider for any items you do not recognize. If necessary, contact the care provider on the explanation of benefits statement and ask for copies of medical records from the date of the potential access (noted above) to current date.

* Ask your insurance company for a current year-to-date report of all services paid for you as a beneficiary. Follow up with your insurance company or the care provider for any items you do not recognize.